Filed 9/30/21  P. v. Webster CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SARA ELIZABETH WEBSTER,<br><br>    Defendant and Appellant. | A157407<br><br>(Contra Costa County<br> Super. Ct. No. 5-180948-2) |

On May 24, 2018, the Contra Costa County District Attorney filed an information charging defendant Sara Elizabeth Webster with elder or dependent adult abuse resulting in death (Pen. Code, § 368, subd. (b)(1))[1] (count 1), and involuntary manslaughter (§ 192, subd. (b)) (count 2), following the death of her father, Henry Webster.

On February 14, 2019, three days before the commencement of trial, the court granted defendant's motion to represent herself in accordance with *Faretta v. California* (1975) 422 U.S. 806.[2]  Defendant represented herself

---

[1] All statutory references are to the Penal Code.

[2] Defendant invoked her *Faretta* right after denial of her *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118) at a hearing on October 7, 2018.  At that hearing, defendant claimed that the public defender failed to talk to the coroner, failed to subpoena her father's medical records, had talked to her only once during the 10 months he had been representing her, failed to return her phone calls, and never described the basis of his defense

1

throughout trial and during all sentencing proceedings. Although defendant cross-examined virtually all of the prosecution witnesses, she was the only witness who testified on her behalf and did so in a narrative format. A great deal of her testimony was successfully objected to as irrelevant or hearsay. Defendant was found guilty on both counts and the allegation her victim was over the age of 70 at the time of his death (§ 368, subd. (b)(3)) was found true.

Defendant's motion for new trial was heard and denied on May 3, 2019. Defendant was sentenced to state prison for a term of two years, the mitigated term on count 1. The identical term imposed on count 2 was stayed pursuant to section 654. The section 368, subdivision (b)(3) enhancement was stricken pursuant to section 1385.

The sole issue presented by this appeal is whether the judgment of conviction must be reversed because the prosecutor committed prejudicial error during closing argument by improperly appealing to the passions of the jury, as defendant claims.

The trial court determined there was no such prejudice and we shall affirm that ruling.

## FACTUAL BACKGROUND

### *The Evidence Produced by the Prosecution*

Around 6:00 p.m. on December 14, 2016, Daniel Skilling, a paramedic, was dispatched to defendant's Concord home in response to her 911 call. When he arrived Skilling found Henry Webster, defendant's father, near

---

or identified witnesses on her behalf, although she had suggested several. Defendant told the court that she felt assigned counsel was "trying to move me into prison." After hearing from the public defender, who impressively described the details of his professional diligence and devotion to defendant's case, the court concluded he was "performing to the standards of a reasonable attorney" and denied defendant's *Marsden* motion. Almost immediately, defendant asserted her right to represent herself pursuant to *Faretta*.

2

death.  His eyes were open, but he was unresponsive, barely breathing, and his blood sugar level was comparable to that of a diabetic.  He was unable to stand or talk and was wearing a diaper soaked with urine and fecal matter.  Skilling transported Webster to John Muir Medical Center.

Katie Woodside, the emergency room nurse at John Muir, observed dried stool on Webster's lower back and one of his legs, and a large bed sore on one leg and on his shoulder.  The stool in his diaper was dark and "tarry," indicating the presence of blood.  His mouth was dry, and his lips cracked indicating extreme dehydration, and his scrotum and penis were red and raw, apparently because he had been sitting in urine for an extended period.  Webster was suffering from flexion contractures that prevented him from straightening his legs, an affliction caused by lack of movement during a long period of time.  When questioned by Woodside about her father's condition, defendant said she had bathed and fed him that morning.

Webster died the morning after he arrived at John Muir.  Shortly after his death, Woodside contacted the police and reported that Webster's death resulted from negligent care.

Webster, who suffered from dementia, had been living alone in Oakley prior to 2016.  He was receiving a pension from Amtrak of over $1900 per month and also receiving assistance from Lucretia Keys, his daughter and defendant's half sister, and Lester Webster (Lester), defendant's brother.

As Webster's dementia worsened, Keys and Lester hired Brenda Green to assist him as a home health care worker.  Green provided assistance five days a week and Keys for the remaining two days.  Keys paid Green $800 per month.  At some point, Keys replaced Green with Lester's daughter, Shinice Calhoun, who accepted $400 per month when Keys and Lester "were having a tough month."

3

In April 2016, after Webster was hospitalized for two or three days due to a medical emergency, the manager of his apartment told Keys her father could not return to the apartment unless the family provided around the clock care. After it became clear Webster could not continue to live alone, he moved in with Calhoun. Keys testified that at that point, defendant "actually begged me" to let her take their father from Calhoun's home into her own home, where she would care for him when she was not working, and her son, Baboucar Daffeh, would care for him when she was at work. Keys tried to talk defendant out of this, because she did not think defendant appreciated the difficulties in caring for their father, but Keys ultimately relented and Webster moved into defendant's home.

Increasingly concerned about his father living in defendant's house, Lester went there in October 2016 to see how he was doing. No one answered the door, but Lester knew his father was there and called out to him. Webster answered and said he had fallen to the floor and was unable to open the door. After entering the house through a window, Lester found his father on the floor wearing only a diaper and underwear and lifted him back on the bed. Lester also saw that the house was "tore up" and dirty. That was the last time Lester saw or spoke with his father.

Keys testified that she never saw her father after he moved in with defendant and her son. She and Lester periodically called defendant and tried to talk to Webster, but defendant always said he was not available to speak with them. After April 2016, neither Keys nor Lester was contacted by defendant indicating she was unable to care for Webster or needed assistance. Lester and Keys did not learn anything about Webster's condition from defendant until after Webster died. Nor did they ever hear

4

from the hospital although both were listed as contact persons on Webster's medical chart.

During the evening of May 25, 2016, defendant's neighbor, Antonio Juarez, saw an elderly man who lived in defendant's house on the ground, helped him get up, provided him a chair from defendant's front porch, and called 911. When the paramedics arrived and knocked on defendant's door, no one responded. Later, when defendant returned home, Marilyn Fontana, Juarez's wife, told defendant what had happened. Defendant did not inquire whether Webster was hurt, but quickly went into her house. Neither Juarez nor his wife had ever seen nurses or other caregivers in defendant's house during 2016.

Defendant's other next-door neighbor, Heidi Duffy, knew Webster had moved into defendant's house during 2016, but never saw defendant or her son take him on outings, and never saw other caregivers come to the house. Duffy had previously been inside defendant's house and considered its interior a "disaster." Another neighbor, Lauren Isaacson, was at home full-time with a newborn child from June to December 2016. She assumed defendant worked full-time because she never saw defendant, nor did she ever see nurses or other caregivers present at the house.

At some point, Keys had arranged to meet defendant at Webster's previous apartment in Oakley to obtain his personal belongings, but defendant never showed up. Later, defendant explained she had already taken what she wanted and told Keys to give what was left to other residents of the building. She also told Keys she had cancelled Webster's credit cards and checks and obtained new ones so she could have access to his funds.

During the summer of 2016, defendant told Keys she had replaced Webster's nurses and doctors, but did not make clear that Webster was no

5

longer being taken to Dr. Yogesh Trehan, his long term primary care physician. After Webster moved in with defendant, Lester ceased taking him to his appointments with Dr. Trehan and other caregivers. Defendant never told Keys (who had move to Sacramento) or Lester that a week after she commenced caring for Webster, he became very sick and had to be taken to the hospital in an ambulance.

After April 2016, defendant never told Keys or Lester she was unable to meet Webster's needs and needed assistance. Nor did she ever tell them she was returning to work full-time, and Webster would therefore frequently be left alone. Keys testified that if defendant had passed on this information, she would have removed her father from defendant's home and secured proper care for him even if she had to pay for it.

In October 2016, after Keys filed a neglect claim against defendant, Sabina Robertson, a social worker with Contra Costa County Adult Protective Services, went to defendant's home to investigate. When no one answered the door, she shouted into a window. She heard Webster's faint response that he was not in any distress, and told him she would return when defendant was present, and she could speak with him directly. He said that was fine. When Robertson was finally able to reach defendant by phone, their conversation was unpleasant, as defendant was rude and abrasive. Nevertheless, after learning Robertson might be able provide some supportive services, defendant agreed to meet with Robertson.

When they met at defendant's house, Robertson found it difficult to breathe due to the strong odor of urine and cigarette smoke. The condition of the house was the messiest Robertson had ever seen; clothes were piled everywhere and there was no place to sit. Robertson found defendant unfriendly and defensive. Defendant said the bad smell resulted from

6

Webster's incontinence and smoking, and noted that taking care of the house was "not her thing," as her priority was her work. Defendant told Robertson that Webster was left alone only for two or three hours at a time, when she and her son had to be at work at the same time. After a conversation with Webster, Robertson concluded he required round-the-clock care.

Defendant objected, saying no doctor had ordered 24-hour care and she lacked the money for that level of care. Robertson said she would send defendant information about day programs, transportation assistance, and other resources available through home care agencies. Robertson also offered to send information concerning mediation services, as she was aware defendant had resisted the efforts of Keys and Lester to see their father.

Officer Mike Von Savoye also investigated Keys's claim of elder abuse and interviewed defendant. She told him the reasons she and Webster's other children decided he should move in with her in June 2016, and noted that at that time she was not working. However, she returned to work four months later. She told Von Savoye that before going to work at 6:00 a.m., she changed Webster's diaper, remade his bed if needed, and fed him breakfast. After that, her son took care of him until noon when he left for work. Webster would then be alone until she returned home from work, around 5:30 or 6:00 p.m. She then changed Webster's diaper and fed him dinner.

Defendant admitted that despite her awareness that Webster's health was steadily deteriorating during the previous two month and he had stopped eating, she did not seek immediate medical attention for him. She did not call 911 on December 14, 2016 until she returned from work that day and found him barely conscious, wet, and unresponsive, and saw a bruise on his chest after removing his shirt. She attributed Webster's bedsores to the fact that he always positioned himself in the same way.

7

Officer Von Savoye testified that Webster's bedroom contained a bare mattress on the floor and bedding inside a garbage can. The house was untidy, and Webster's mattress was stained by urine. Defendant told him she was treating Webster' bedsores with pads and antibiotics.

Concord Police Officer Davis Mattila took photographs of Webster's body at the hospital after his death, which showed sores below his right and left shoulder and a large wound on his right hip. Fecal matter was found smeared on his left buttock. The photos were shown to the jury.

When interviewed by Concord Police Detective Kevin Giacoletto, defendant acknowledged she was Webster's only caregiver and that he was not receiving any in-home services from the county. She also stated that she went back to work full-time because she had exhausted her savings. She used Webster's pension to pay part of her rent, which was $2,200 per month.[3] Defendant denied noticing blood in Webster's stools but reluctantly admitted awareness of his large bedsore, which she said she treated with ointment. At no point did defendant tell Detective Giacoletto that Webster received medical treatment after August 2016, although Dr. Trehan remained his primary care physician until Webster's death. Defendant said Webster experienced changes around Thanksgiving, when he began eating less and had digestive issues, which included vomiting. She sought assistance from county in-home health services, but was told Webster did not qualify for assistance due to his income level.

---

[3] Defendant testified that her bills "started at $2200 a month. When it got to the point where I knew that I was gonna run out of money, the only thing I could actually do was get a job. [¶] So what did I do? [¶] I went and got a job to actually supplement the income. [¶] I, you know, I hated . . . taking money from my father. You know, he said it was okay but, you know, I didn't think it was okay so I . . . started working."

Defendant told Giacoletto that when she left home for work on the morning of December 14, 2016, she was concerned about the way Webster looked. Later, when she arrived home from work, she found him wet and nonresponsive and called 911. She also admitted she has been in denial of the seriousness of Webster's condition and regretted her failure to get him medical care earlier.

Detective Giacoletto also interviewed Baboucar Daffeh, defendant's son, and a recording of the interview was played for the jury. Daffeh said his assistance consisted primarily of moving Webster from one room in the house to another. He did not say he had been trained as a caretaker, or was paid for his services, or that trained caretakers came to the house to assist Webster.

Dr Trehan, who was Webster's only primary care physician since 2008, testified that Webster had diabetes controllable through medication, had a pacemaker that kept his heart condition under control, and suffered from moderate to severe dementia, which allowed him to feel pain. Webster was hospitalized for hypoglycemia on April 3, and again on April 27, 2016. Because his blood level on those occasions was dangerously low, and could cause seizures and/or a coma, Dr. Trehan told Keys and Lester that Webster required full-time care.

Dr. Trehan last saw Webster in August 2016. At that time, he did not notice excoriation or open ulcers, but Webster was incontinent and wearing a diaper. Nor did Trehan detect flexion contractures, which occur in persons with advanced dementia or Parkinson's disease if their limbs aren't moved for extended periods. Such contractures place a patient at high risk of falling and make it difficult to walk, but these dangers can be prevented by physical therapy. Dr. Trehan stated that at the time of Webster's death, the albumin

level of his blood was 1.5, indicating severe malnourishment, and his dark or "tarry" stools were an indication of intestinal bleeding.

Dr. Trehan's records showed he ordered home health services for Webster from May 26 to July 24, 2016, but there was no indication Webster received such visits after July 24. If home health care providers saw that a patient was declining, they would contact the authorizing doctor for additional orders. No home health care provider ever contacted Dr. Trehan reporting bedsores, bruising on his chest, or flexion contractures.

Dr. Arnold Josselson, the county medical examiner, conducted an autopsy of Webster that revealed several pressure ulcers or bedsores on his body, and ulcerations on his exterior genitalia. His teeth were in very poor repair, he had flexion contractures in both legs, and a deep ulcer on his right leg descended into muscle, making it "a stage 4," which led to sepsis and which Dr. Josselson believed contributed to his death. Dr. Josselson also noticed a large contusion on the left side of Webster's chest. He was unable to determine its cause, but said the amount of force necessary to cause such an injury would be a direct blow to the chest or a fall. The low level of protein in Webster's blood and his appearance led Dr. Josselson to conclude Webster was malnourished, and his dry mouth indicated dehydration. Although Webster had a pacemaker, smoked, and was diabetic, his death was not caused by heart or lung disease or diabetes, but by anemia and dehydration. If he had been hospitalized sooner, he would likely have survived.

### Defendant's Defense

In her opening brief, defendant succinctly describes her defense as follows: Defendant "took the witness stand on her own behalf and testified she took Webster into her home because he was unable to care for himself. Thereafter, he not only received care from defendant and her son, but from

10

an in-home caretaker, who visited three times a week, as well as nurses and a therapist." Defendant "returned to work, in part, because Webster's monthly pension payments did not cover all of his expenses. When she returned to work full time, she tailored her schedule so that she could take care of her father. Her son, Daffeh, helped out as well." Her plan was to pay for full time care for her father. Defendant "noticed a change in her father's health after Thanksgiving 2016. His dementia seemed to worsen. He also began developing bedsores due to immobility." Defendant "cared for the wounds."

Defendant "took well care of Webster, buying him fresh fruits and vegetables primarily from the farmer's market. She also did not prevent family members from contacting her father. "On December 13, 2016, defendant called 911 after noticing a spot of [*sic*] Webster's chest and that his health had deteriorated. Later, at the hospital, defendant asked the treating physician to do everything they could to save her father.

"Brenda Greene was Webster's caretaker from January 2013 until June 2014. She attended to his needs seven days a week.

"Alva Evans held Thanksgiving in 2016 at her home and defendant and Webster were among the guests. Webster was able to partake in the feast."

Defendant's description of her defense, which relies entirely on her own testimony, emphasizes the many difficulties defendant confronted in caring for her father, and the sacrifices she made; but it ignores the inconsistent testimony of virtually every other witness regarding the many deficiencies in the care she provided and her failure to seek medical care while her father's health was obviously deteriorating rapidly.

## DISCUSSION

## I.

As we have said, the sole issue before us is whether, as defendant claims, the prosecutor's closing argument to the jury so "inflamed the jury against defendant by leading them to believe she was not being held fully responsible for her acts and omissions" that it resulted in a denial of defendant's federal and state constitutional rights to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution. (See *Darden v. Wainwright* (1986) 477 U.S. 168, 181 (*Darden*); *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642 (*Donnelly*).) According to defendant, the prosecutor made clear that defendant was, in fact, guilty of second degree murder, not merely elder abuse; and this misinformation induced the jury to return guilty verdicts, not because she was guilty of the charged offenses, but because she was culpable of a more serious crime. The statements at issue relate to the prosecutor's stated concern that jurors might conclude that she failed to prove defendant actually knew her conduct would result in the death of her father or specifically intended it, though such knowledge and specific intent were not elements of the charged offenses. As the prosecutor prefaced the questioned remarks, "I'm a little bit nervous that you as jurors, because you have good hearts, [a]re going to want to say, I'm not sure the DA proved she knew or intended this, and [i]f you hold me to that standard, all 12 of you may not get there."

Addressing the perceived problem, the prosecutor embarked upon an expansive disquisition regarding "the law of homicide," stating as follows: "So, I'm going to stack this criminal negligence right up to the law of homicide and show you what we're doing here. This is the law of

12

homicide. . . . What is murder? Murder is the unlawful killing of a human being with malice [a]forethought. That's important. You hear about malice in the movies. That's with malice [a]forethought. When you kill somebody with malice unlawfully, that's murder.

"Unlawful is a pretty important word in there, right? What if you're a warden in a prison executing under a lawful death penalty order? What if someone breaks into the home at night tries to kill your family and you kill that human being? That's lawful. So, there are types of lawful killings with malice [a]forethought.

"For second degree murder, you have malice. And there's two different types of malice; express and implied. Express malice is, I don't like you, I have a motive to kill you, and I'm going to kill you. A lot of times people kill someone, they don't spell it out for us, but we can infer when they shoot someone in the head that they had express malice.

"Implied malice—and this is what I want you to know—implied malice murder is no intent to kill. The type of implied malice murder that we see most often is truly tragic. We see it in the drunk driving cases. Somebody who drinks too much, takes to the road, crashes because of the alcohol, and kills a whole family minivan. Did that person have any intent to kill people that night? No. Are they devastated and remorseful? Yes. Did the person have any animosity toward that family? No. But the problem is that if you are aware of a risk to human life and you consciously disregard that known risk, under the eyes of the law, that's called implied malice. You didn't actually have malice, but we're going to apply it based on your conduct and hold you liable for murder.

"So, let me give you a couple examples of cases where second degree murder could be found. There was a five-month-old baby who died of

malnutrition and dehydration. Sound familiar? The defendant was a parent and he had passive conduct. He didn't do anything to the baby; he just didn't feed it or hydrate it. The baby died. Because the evidence showed that the baby was starving to death the last two weeks, nobody could remember the baby getting anything to eat. The colored photographs showed that he must have appreciated that his baby was in a state of starvation. That was implied malice. It was a conscious disregard of a known fact. That's an example of implied malice murder. Because it was shown that that defendant knew about the baby looking starved.

"Another case, a teenager who had a form of diabetes and she died of diabetic ketoacidosis and the parents were charged. You've known her for 17 years. You knew she had diabetes. You were schooled in what that looked like. The neighbors told you she's not looking good; you should get medical help. And they showed some indifference. Convicted of implied malice murder, because they constantly disregarded. They knew and they didn't do anything.

"Nobody is accusing this defendant of murder. I'm not proving to you that she knew how sick he was. It's really important that you realize that. I don't expect all 12 of you to find that. So, quickly, that's what second degree murder is.

"In order to go up to first degree murder, you have to have something extra like premeditation and deliberation, killing by poisoning, killing while raping someone. And then it gets worse from there. For a special circumstances murder you have to have something more special to get to that level of murder. But that's neither here nor there for this trial. I want to cycle down now from second degree murder and get down to the family of manslaughter where we are. There's two different types of manslaughter;

voluntary and involuntary. Voluntary manslaughter is known as your sudden heat of passion. For in the eyes of the law, when you intentionally kill somebody that you didn't have time to form malice because it was so sudden, the law will kind of give you a pass and say, okay that wasn't murder because you didn't have time to form malice. We're just going to call that a voluntary manslaughter.

"And then we get finally to us and the law of homicide but not murder; involuntary manslaughter. And the instructions told you it's not the defendant's standard. It's not, . . . did the defendant know? It is, would a reasonable person have noticed the bruising, the hole in the hip, the hole in the shoulder, the emaciation, the massive weight loss, the dehydration, the caked stools, the ulcers on the scrotum and the penis. Would a reasonable person have done something? Not a reasonable person under those circumstances. Not the defendant. I don't have to prove to you that the defendant knew about it and consciously disregarded the risk. That is the elements of murder. Please don't hold me to that standard. It's just criminal negligence and that's why I went through that law.

"For involuntary manslaughter there's no malice. I told you in jury selection, mom leaves the baby in the hot car. Forgets. I don't know what happened. She left that baby in the hot car for 12 hours. There's no evidence she wanted that baby to die. That's involuntary manslaughter. There's no requirement that the defendant knew or appreciated the risk and then consciously disregarded it. That's the murder standard. And I already told you about laden and burdened [*sic*] to make sure you understand and don't hold me to a higher standard."

Defendant's theory is that "[r]ather than urge the jury to decide the case against defendant based on the evidence presented at trial, the

prosecutor offered examples of second degree murder that hewed closely to the facts of defendant's case. The prosecutor did so to inflame the jury against defendant by leading them to believe that defendant was in fact guilty of murdering her father. Thus, the prosecutor sought to have the jury convict defendant 'for reasons wholly irrelevant to [her] own guilt or innocence.'" (Quoting *United States v. Koon* (9th Cir. 1994) 34 F.3d 1416, 1443.)

Defendant did not timely raise this issue at the time of trial, when it could have been cured, but she did raise it belatedly at the hearing on her motion for a new trial. Referring to the district attorney's closing argument as her "instructions," defendant argued that "when the prosecutor gave the instructions to the jury, she constantly put up murder, murder. Inundating the jury with the term 'murder.' You know, this actually . . . when the jury looks at that . . . [i]f I was, you know, being the lay person, wow, you know, murder, murder. It has to be a murder case over all the information, the barrage of information that was given, well, it has to be murder. Although there was no murder given [i.e., charged]—there was no murder indicated. But in the jury instruction, that is what she inundated [*sic*] -- inundated the jury with the term murder, murder, murder. She used -- she said 'willfully' and she blatantly . . . . She uses -- she said 'willfully' does not mean done on purpose. . . . And the example she used was having a baby left in the car, but they really didn't mean . . . to do it so that means they didn't do it on purpose. That is not willfully. She said that you would actually be charged with manslaughter because of doing that." Defendant contended that the facts of the case involving the leaving of the baby in the car was used by the prosecutor to distort the use of the word "willfully" and give the jury "false information." "[S]aying that willfully does not mean done on purpose when

16

willfully means done on purpose.  Yes, the instructions that were given to the jury [by the prosecutor], yes, they were very prejudicial and very, very inflammatory."

The prosecutor responded as follows:  "I did talk about what the difference between malice was and this voluntary manslaughter had an absence of malice so they could compare and contrast the different concepts . . . because it's very easy for a jury to get confused and want some sort of specific intent or maliciousness for a voluntary [*sic*] manslaughter that is simply criminal negligence. . . .  I don't think it was objectionable in any way"; "[t]he People never accused the defendant of murder."

The fact defendant was never accused of murder seems to us beside defendant's point.  The problem presented by the prosecutor's convoluted closing statements is not that they accused defendant of a greater offense than those charged but, as defendant argues, that she was not being held as fully responsible for her criminal acts and omissions as she could and should have been.  For example, the prosecutor pointed out that "if you are aware of a risk to human life and you consciously disregard that known risk, under the eyes of the law, that's called implied malice," and you could thereby be held liable for murder.  This statement was followed by the example of a five-month-old baby who, like Webster, died of malnutrition and dehydration.  Tendentiously inquiring whether those causes of death "[sounded] familiar," the prosecutor pointed out that though the child's parent "didn't do anything to the baby . . . he just didn't feed it or hydrate it," "the baby died," and the parent was—presumably—convicted of murder on the basis of an implied malice theory.

The prosecutor drove the point home by adding, "[f]or involuntary manslaughter there's no malice. . . .  [M]om leaves the baby in the hot car.

17

Forgets.  I don't know what happened.  She left that baby in the hot car for 12 hours.  There's no evidence she wanted that baby to die.  That's involuntary manslaughter.  There's no requirement that the defendant knew or appreciated the risk and then consciously disregarded it.  That's the murder standard."  According to defendant, these statements suggested defendant could have been guilty of second degree murder, and she therefore should certainly be convicted of involuntary manslaughter, the most serious offense charged.  Defendant believes the prosecutor's example could have provided the jury incentive to find defendant guilty not because she was guilty of the crimes charged, but because she was culpable of a crime more serious than those charged.

We are unimpressed with the Attorney General's argument that the fact patterns employed by the prosecutor usefully illustrated the difference between criminal negligence and implied malice.  First of all, the convoluted remarks of the district attorney were not just confusing but unnecessary, as the instructions given jurors by the court made eminently clear the specific findings necessary to convict defendant of elder abuse resulting in death[4] and

---

[4] The court's instructions told the jury that to convict defendant of the lesser included crime of elder abuse charged in count 1 and involuntary manslaughter as charged in count 2, "the evidence must prove that the defendant not only committed the prohibited act or failed to do the required act, but also that the defendant acted with wrongful intent . . . when he or she intentionally does a prohibited account [*sic*] or intentionally fails to do a required act.  However, it is not required that he or she intends to break the law.  The act or failure to act required to be proved are explained for each crime in Instructions 830, 831 and 582 -- those instructions come later -- which are set forth in these instructions."

Instruction No. 830 told the jury that defendant was charged with elder abuse likely to produce great bodily harm or death and that to prove guilt of that offense "the People must prove beyond a reasonable doubt five things: First, the defendant, (a) willfully caused or permitted Henry Webster to

involuntary manslaughter,[5] the most serious offense at issue in this case. Clarity was not advanced by statements lay jurors could have interpreted as suggesting that defendant could and perhaps should have been charged with "murder." Moreover, clarification of the difference between the findings that support implied malice and those necessary to support criminal negligence, if

suffer unjustifiable physical pain or mental suffering; or (b) while having care and custody of Henry Webster, willfully caused or permitted him to be placed in a situation where his person or health was in danger.

"Number two, the defendant willfully caused or permitted Henry Webster to suffer unjustifiable physical pain or to be endangered under circumstances or conditions likely to produce great bodily harm or death. Three, Henry Webster was an elder adult. Four, when the defendant acted or failed to perform a required act, she knew or reasonably should have known that Henry Webster was an elder adult. And five, the defendant was criminally negligent when she caused unjustifiable physical pain or mental suffering or to be in danger."

The jury was told that "[s]omeone commits an act willfully when he or she does it willingly or on purpose," and "[g]reat bodily injury or great bodily harm means significant or substantial physical injury . . . that is greater than minor or moderate harm."

The jury was also instructed that "[a] person acts with criminal negligence when, Number one, he or she acts in a reckless way that creates a high risk of death or great bodily injury harm; and number two, a reasonable person would have known that acting in that way would create such a risk. In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation, that his or her act, or failure to act, amounts to a disregard for human life or indifference to the consequences of that act."

[5] The jury was told that to convict defendant of involuntary manslaughter "the People must prove beyond a reasonable doubt four things. Number one, the defendant had a legal duty to Henry Webster. Number two, the defendant failed to perform that legal duty. Number three, the defendant['s] failure was criminally negligent. Number four, the defendant's failure caused the death of Henry Webster." The court then provided the jury the same definition of criminal negligence that it provided in connection with elder abuse.

19

any was needed, certainly did not require reference to factual patterns confusingly coincidental with those in this case, which appears to have been intentional.

Defendant acknowledges she made no timely objection to the prosecutor's confusing closing statements on "the law of homicide," but justifies the omission on the ground that "an admonition from the court would not have eliminated the prejudicial impact of the identified misconduct." As defendant sees it, the prosecutor's statements were "so egregious that [they] infect[ed] the trial with such unfairness as to make the conviction a denial of due process." (Citing *Darden*, *supra*, 477 U.S. at p. 181; *Donnelly*, *supra*, 416 U.S. at p. 642.) Defendant claims the prosecutor's statements were "deceptive" and "reprehensible" attempts "to shortcut the [criminal justice] process, and thereby circumvent [defendant's] constitutional rights by inflaming the jury against her through an improper argument." Because "the prosecutor sought to have the jury convict [defendant] 'for reasons wholly irrelevant to [her] own guilt or innocence' " (quoting *United States v. Koon, supra*, 34 F.3d at p. 1443), defendant claims she suffered a denial of due process warranting judicial consideration despite her failure to make a timely objection.

## II.

While we find the prosecutor's statements unnecessary and somewhat confusing, we cannot say they comprised a pattern of conduct so egregious that it infected the trial with such unfairness as to make the conviction a denial of due process. (*Darden, supra*, 477 U.S. at p. 181; *Donnelly, supra*, 416 U.S. at p. 642.) Defendant points out that " '[c]onduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or

20

reprehensible methods to attempt to persuade either the court or the jury' " ' " (*People v. Harris* (2005) 37 Cal.4th 310, 341, quoting *People v. Benavides* (2005) 35 Cal.4th 69, 108), and under this standard the defendant need not show that the prosecutor acted in bad faith or with appreciation for the wrongfulness of the conduct, nor is a claim of prosecutorial misconduct defeated by a showing of the prosecutor's subjective good faith. (*People v. Ochoa* (1998) 19 Cal.4th 353, 427; *People v. Bradford* (1997) 15 Cal.4th 1229, 1333.) As noted, defendant believes the statements made by the prosecutor here were both deceptive and reprehensible.

We believe that is too far a stretch. The statements were clearly inartful, but their purpose—explanation of those homicides that require the prosecution to show express or implied malice and those, like criminal negligence, which do not—cannot fairly be described as deceptive or reprehensible, nor can those adjectives be attached to the factual scenarios employed by the prosecutor, none of which likely inflamed the jury.

Moreover, even if one indulges defendant's assumptions that the statements were deceptive, reprehensible, and inflammatory, they were not objected to, and a claim of prosecutorial misconduct is not preserved for appeal where the defendant failed to make a specific and timely objection unless it would have been futile. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) "A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition will not have cured the harm." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.) Defendant claims she is relieved of the need to have objected because here an admonition would not have cured the harm of prosecutorial statements suggesting defendant's culpability was commensurate with that of defendants who, like her, consciously disregarded a known risk to their victim but, unlike her, were

21

charged and found to have acted with implied malice and therefore exposed to conviction of more serious homicides than was defendant.

As the Attorney General points out, however, relevant case law shows that more overt and odious comparisons than those suggested by the prosecutor here, have been found not to be misconduct *when they relate primarily to the operation of the law*, and the failure to timely object resulted in forfeiture of the claim. For example, in *People v. Ghobrial* (2018) 5 Cal.5th 250, in which the defendant, an Egyptian immigrant, was convicted of first degree murder during the commission of a lewd and lascivious act on a child, the prosecutor referred to Osama bin Laden, Al Qaeda, and the terrorists who perpetrated the September 11 attacks. The defendant objected to the prosecutor's statement that Osama bin Laden was an "evil man" only on the ground of relevance, and it was sustained, but sought no admonition. In concluding that the there was no reasonable possibility the prosecutor's comments affected the jury's verdict, the court observed that "while we have advised prosecutors generally to ' "refrain from comparing defendants to historic or fictional villains, . . ." ' we have also held that it is not misconduct for a prosecutor to invoke examples to illustrate a general point about the operation of the law." (*Id.* at pp. 290–291, citing *People v. Jones* (1997) 15 Cal.4th 119, 180.) It was clear, the court said, "that the prosecutor was not referring to defendant's emigration from Egypt in an effort to inflame the jury's biases, but instead to minimize the mitigating impact of defendant's lack of criminal history and evidence concerning his mental health." (*Ghobrial*, at p. 291.) The prosecutor did not suggest that the defendant was culpable for his crimes because of any connection with September 11, the terrorists, or their racial background. The references "were instead designed to illustrate general legal points relevant to the prosecutor's argument—

namely, that a defendant's mental illness does not always negate criminal liability." (*Id*. at p. 290.)

In this case, first, it is undisputed that the jury was properly instructed by the court on the elements of the charged offenses. In the absence of any reason to think the jury failed to understand and follow the court's instructions, we must presume they understood and followed those instructions. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1026; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.)

Furthermore, the evidence of defendant's guilt was overwhelming. (See, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 186 [where jury was properly instructed and evidence of defendant's guilt was overwhelming, any alleged prosecutorial misconduct in closing argument was harmless under either federal or state standard of error].) As the trial court observed when it denied defendant's motion for a new trial: "The defendant took care and custody of Mr. Webster and the evidence established that she willfully engaged in grossly negligent conduct that was the primary reason why Mr. Webster died. . . . [¶] Dr. Josselson's evaluation made it quite clear what he died of, which is anemia dehydration. . . . [A]s Mr. Webster became less mobile, it became more incumbent upon the defendant to make sure that he was adequately hydrated and had adequate nourishment and it is clear from the testimony of Dr. Josselson that he died from lack of food and lack of hydration. . . . [T]here was nothing in the evidence suggest[ing] that there were independent reasons for that other than the defendant's negligent behavior." As the trial court justifiably found, "the jury must have concluded here that the defendant's testimony was not correct in significant respects."

23

Accordingly, even assuming the prosecutor committed error during closing argument, defendant suffered no prejudice as a result. (See *People v. Booker, supra*, 51 Cal.4th at p. 186.)

## DISPOSITION

The judgment is affirmed.

 

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


_People v. Webster_ (A157407)

25